# GROWE, SECRETARY OF STATE OF MINNESOTA, ET AL. *v.* EMISON ET AL.

No. 91–1420.   Argued November 2, 1992—Decided February 23, 1993

SCALIA, J., delivered the opinion for a unanimous Court.

*John R. Tunheim,* Chief Deputy Attorney General of Minnesota, argued the cause for appellants. With him on the briefs were *Hubert H. Humphrey III,* Attorney General, *Jocelyn F. Olson,* Assistant Attorney General,

*John D. French, Michael L. Cheever, Peter S. Wattson,* and *Alan W. Weinblatt.*

*Solicitor General Starr* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Acting Deputy Assistant Attorney General Simon,* and *Jessica Dunsay Silver.*

*Bruce D. Willis* argued the cause for appellees. With him on the brief was *Mark B. Peterson.*\*

JUSTICE SCALIA delivered the opinion of the Court.

This case raises important issues regarding the propriety of the District Court's pursuing reapportionment of Minnesota's state legislative and federal congressional districts in the face of Minnesota state-court litigation seeking similar relief, and regarding the District Court's conclusion that the state court's legislative plan violated § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973.

I

In January 1991, a group of Minnesota voters filed a state-court action against the Minnesota Secretary of State and other officials responsible for administering elections, claiming that the State's congressional and legislative districts were malapportioned, in violation of the Fourteenth Amendment of the Federal Constitution and Article 4, § 2, of the Minnesota Constitution. *Cotlow* v. *Growe,* No. C8–91–985. The plaintiffs asserted that the 1990 federal census results revealed a significant change in the distribution of the state population, and requested that the court declare the current districts unlawful and draw new districts if the legislature failed to do so. In February, the parties stipulated that, in light of the new census, the challenged districting plans were

---

\**Robert B. Wallace* and *Jeffrey M. Wice* filed a brief for Congressman Martin Frost et al. as *amici curiae* urging reversal.

unconstitutional. The Minnesota Supreme Court appointed a Special Redistricting Panel (composed of one appellate judge and two district judges) to preside over the case.

In March, a second group of plaintiffs filed an action in federal court against essentially the same defendants, raising similar challenges to the congressional and legislative districts. *Emison* v. *Growe*, Civ. No. 4–91–202. The *Emison* plaintiffs (who include members of various racial minorities) in addition raised objections to the legislative districts under § 2 of the Voting Rights Act, 42 U. S. C. § 1973, alleging that those districts needlessly fragmented two Indian reservations and divided the minority population of Minneapolis. The suit sought declaratory relief and continuing federal jurisdiction over any legislative efforts to develop new districts. A three-judge panel was appointed pursuant to 28 U. S. C. § 2284(a).

While the federal and state actions were getting underway, the Minnesota Legislature was holding public hearings on, and designing, new legislative districts. In May, it adopted a new legislative districting plan, Chapter 246, Minn. Stat. §§ 2.403–2.703 (Supp. 1991), and repealed the prior 1983 apportionment. It was soon recognized that Chapter 246 contained many technical errors—mistaken compass directions, incorrect street names, noncontiguous districts, and a few instances of double representation. By August, committees of the legislature had prepared curative legislation, Senate File 1596 and House File 1726 (collectively, Senate File 1596), but the legislature, which had adjourned in late May, was not due to reconvene until January 6, 1992.

Later in August, another group of plaintiffs filed a second action in federal court, again against the Minnesota Secretary of State. *Benson* v. *Growe*, No. 4–91–603. The *Benson* plaintiffs, who include the Republican minority leaders of the Minnesota Senate and House, raised federal and state constitutional challenges to Chapter 246, but no Voting

Rights Act allegations. The *Benson* action was consolidated with the *Emison* suit; the *Cotlow* plaintiffs, as well as the Minnesota House of Representatives and State Senate, intervened.

With the legislature out of session, the committees' proposed curative measures for Chapter 246 pending, and the state court in *Cotlow* considering many of the same issues, the District Court granted the defendants' motion to defer further proceedings pending action by the Minnesota Legislature. It denied, however, defendants' motion to abstain in light of the *Cotlow* suit, or to allow the state court first to review any legislative action or, if the legislature failed to act, to allow the state court first to issue a court-ordered redistricting plan. The District Court set a January 20, 1992, deadline for the state legislature's action on both redistricting plans, and appointed special masters to develop contingent plans in the event the legislature failed to correct Chapter 246 or to reapportion Minnesota's eight congressional districts.

Meanwhile, the *Cotlow* panel concluded (in October) that Chapter 246, applied as written (*i. e.*, with its drafting errors), violated both the State and Federal Constitutions, and invited the parties to submit alternative legislative plans based on Chapter 246. It also directed the parties to submit by mid-October written arguments on any Chapter 246 violations of the Voting Rights Act. In late November, the state court issued an order containing its preliminary legislative redistricting plan—essentially Chapter 246 with the technical corrections (though not the stylistic corrections) contained in Senate File 1596. (Since no party had responded to its order concerning Voting Rights Act violations, the court concluded that Chapter 246 did not run afoul of that Act.) It proposed putting its plan into effect on January 21, 1992, if the legislature had not acted by then. Two weeks later, after further argument, the *Cotlow* panel indicated it

30

would release a revised and final version of its legislative redistricting plan in a few days.

In early December, before the state court issued its final plan, the District Court stayed all proceedings in the *Cotlow* case, and enjoined parties to that action from "attempting to enforce or implement any order of the . . . Minnesota Special Redistricting Panel which has proposed adoption of a reapportionment plan relating to state redistricting or Congressional redistricting." App. to Juris. Statement 154. The court explained its action as necessary to prevent the state court from interfering with the legislature's efforts to redistrict and with the District Court's jurisdiction. It mentioned the *Emison* Voting Rights Act allegations as grounds for issuing the injunction, which it found necessary in aid of its jurisdiction, see 28 U. S. C. § 1651. One judge dissented.

Four days later the state court issued an order containing its final legislative plan, subject to the District Court's injunction and still conditioned on the legislature's failure to adopt a lawful plan. The same order provided, again subject to the District Court's injunction, that congressional redistricting plans be submitted by mid-January. The obstacle of the District Court injunction was removed on January 10, 1992, when, upon application of the *Cotlow* plaintiffs, we vacated the injunction. 502 U. S. 1022.

When the legislature reconvened in January, both Houses approved the corrections to Chapter 246 contained in Senate File 1596 and also adopted a congressional redistricting plan that legislative committees had drafted the previous October. The Governor, however, vetoed the legislation. On January 30, the state court issued a final order adopting its legislative plan and requiring that plan to be used for the 1992 primary and general elections. By February 6, pursuant to an order issued shortly after this Court vacated the injunction, the parties had submitted their proposals for congressional redistricting, and on February 17 the state court held hearings on the competing plans.

Two days later, the District Court issued an order adopting its own legislative and congressional districting plans and permanently enjoining interference with state implementation of those plans. 782 F. Supp. 427, 448–449 (Minn. 1992). The *Emison* panel found that the state court's modified version of Chapter 246 "fails to provide the equitable relief necessary to cure the violation of the Voting Rights Act," *id.*, at 440, which in its view required at least one "super-majority minority" Senate district, a district in which the minority constitutes a clear majority. The District Court rejected Chapter 246 as a basis for its plan, and instead referred to state policy as expressed in the Minnesota Constitution and in a resolution adopted by both Houses of the legislature. See Minn. Const., Art. 4, § 2; H. R. Con. Res. No. 2, 77th Leg., Reg. Sess. (1991). Judge MacLaughlin dissented in part. The District Court was unanimous, however, in its adoption of a congressional redistricting plan, after concluding that the pre-existing 1982 plan violated Art. I, § 2, of the Federal Constitution. Although it had received the same proposed plans submitted to the state court earlier that month, it used instead a congressional plan prepared by its special masters. Finally, the District Court retained jurisdiction to ensure adoption of its reapportionment plans and to enforce the permanent injunction.

In early March, the state court indicated that it was "fully prepared to release a congressional plan" but that the federal injunction prevented it from doing so. In its view, the federal plan reached population equality "without sufficient regard for the preservation of municipal and county boundaries." App. to Juris. Statement 445–446.

Appellants sought a stay of the District Court's February order pending this appeal. JUSTICE BLACKMUN granted the stay with respect to the legislative redistricting plan. No. 91–1420 (Mar. 11, 1992) (in chambers). We noted probable jurisdiction. 503 U. S. 958 (1992).

## II

In their challenge to both of the District Court's redistricting plans, appellants contend that, under the principles of *Scott* v. *Germano,* 381 U. S. 407 (1965) *(per curiam),* the court erred in not deferring to the Minnesota Special Redistricting Panel's proceedings.   We agree.

The parties do not dispute that both courts had jurisdiction to consider the complaints before them.   Of course federal courts and state courts often find themselves exercising concurrent jurisdiction over the same subject matter, and when that happens a federal court generally need neither abstain (*i. e.,* dismiss the case before it) nor defer to the state proceedings (*i. e.,* withhold action until the state proceedings have concluded).   See *McClellan* v. *Carland,* 217 U. S. 268, 282 (1910).   In rare circumstances, however, principles of federalism and comity dictate otherwise.   We have found abstention necessary, for example, when the federal action raises difficult questions of state law bearing on important matters of state policy, or when federal jurisdiction has been invoked to restrain ongoing state criminal proceedings.   See *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800, 814–817 (1976) (collecting examples).   We have required deferral, causing a federal court to "sta[y] its hands," when a constitutional issue in the federal action will be mooted or presented in a different posture following conclusion of the state-court case.   *Railroad Comm'n of Texas* v. *Pullman Co.,* 312 U. S. 496, 501 (1941).[1]

---

[1] We have referred to the *Pullman* doctrine as a form of "abstention," see 312 U. S., at 501–502.   To bring out more clearly, however, the distinction between those circumstances that require dismissal of a suit and those that require postponing consideration of its merits, it would be preferable to speak of *Pullman* "deferral."   *Pullman* deferral recognizes that federal courts should not prematurely resolve the constitutionality of a state statute, just as *Germano* deferral recognizes that federal courts should not prematurely involve themselves in redistricting.

In the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself. In *Germano*, a Federal District Court invalidated Illinois' Senate districts and entered an order requiring the State to submit to the court any revised Senate districting scheme it might adopt. An action had previously been filed in state court attacking the same districting scheme. In that case the Illinois Supreme Court held (subsequent to the federal court's order) that the Senate districting scheme was invalid, but expressed confidence that the General Assembly would enact a lawful plan during its then current session, scheduled to end in July 1965. The Illinois Supreme Court retained jurisdiction to ensure that the upcoming 1966 general elections would be conducted pursuant to a constitutionally valid plan.

This Court disapproved the District Court's action. The District Court "should have stayed its hand," we said, and in failing to do so overlooked this Court's teaching that state courts have a significant role in redistricting. 381 U. S., at 409.

> "The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.
>
> ". . . The case is remanded with directions that the District Court enter an order fixing a reasonable time within which the appropriate agencies of the State of Illinois, including its Supreme Court, may validly redistrict the Illinois State Senate; provided that the same be accomplished within ample time to permit such plan to be utilized in the 1966 election . . . ." *Ibid.* (citations omitted).

34

Today we renew our adherence to the principles expressed in *Germano*, which derive from the recognition that the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts. See U. S. Const., Art. I, § 2. "We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman* v. *Meier*, 420 U. S. 1, 27 (1975). Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it.

Judged by these principles, the District Court's December injunction of state-court proceedings, vacated by this Court in January, was clear error. It seems to have been based upon the mistaken view that federal judges need defer only to the Minnesota Legislature and not at all to the State's courts. Thus, the January 20 deadline the District Court established was described as a deadline for the legislature, ignoring the possibility and legitimacy of state *judicial* redistricting. And the injunction itself treated the state court's provisional legislative redistricting plan as "interfering" in the reapportionment process. But the doctrine of *Germano* prefers *both* state branches to federal courts as agents of apportionment. The Minnesota Special Redistricting Panel's issuance of its plan (conditioned on the legislature's failure to enact a constitutionally acceptable plan in January), far from being a federally enjoinable "interference," was precisely the sort of state judicial supervision of redistricting we have encouraged. See *Germano*, 381 U. S., at 409 (citing cases).

Nor do the reasons offered by the District Court for its actions in December and February support departure from the *Germano* principles. It is true that the *Emison* plaintiffs alleged that the 1983 legislative districting scheme vio-

lated the Voting Rights Act, while the *Cotlow* complaint never invoked that statute. *Germano*, however, does not require that the federal and state-court complaints be identical; it instead focuses on the nature of the relief requested: reapportionment of election districts. Minnesota can have only one set of legislative districts, and the primacy of the State in designing those districts compels a federal court to defer.

The District Court also expressed concern over the lack of time for orderly appeal, prior to the State's primaries, of any judgment that might issue from the state court, noting that Minnesota allows the losing party 90 days to appeal. See Minn. Rule Civ. App. Proc. 104.01. We fail to see the relevance of the speed of appellate review. *Germano* requires only that the state agencies adopt a constitutional plan "within ample time . . . to be utilized in the [upcoming] election," 381 U. S., at 409. It does not require appellate review of the plan prior to the election, and such a requirement would ignore the reality that States must often redistrict in the most exigent circumstances—during the brief interval between completion of the decennial federal census and the primary season for the general elections in the next even-numbered year. Our consideration of this appeal, long after the Minnesota primary and final elections have been held, itself reflects the improbability of completing judicial review before the necessary deadline for a new redistricting scheme.

It may be useful to describe what ought to have happened with respect to each redistricting plan. The state court entered its judgment adopting its modified version of Chapter 246 in late January (nearly three weeks before the federal court issued its opinion). That final order, by declaring the legislature's version of Chapter 246 unconstitutional and adopting a legislative plan to replace it, altered the status quo: The state court's plan became the law of Minnesota. At the very least, the elementary principles of federalism and comity embodied in the full faith and credit statute, 28

U. S. C. § 1738, obligated the federal court to give that judgment *legal effect*, rather than treating it as simply one of several competing legislative redistricting proposals available for the District Court's choosing. See *Atlantic Coast Line R. Co.* v. *Locomotive Engineers*, 398 U. S. 281, 286, 296 (1970). In other words, after January 30 the federal court was empowered to entertain the *Emison* plaintiffs' claims relating to legislative redistricting only to the extent those claims challenged the *state court's* plan. Cf. *Wise* v. *Lipscomb*, 437 U. S. 535, 540 (1978) (opinion of WHITE, J.).

With respect to the congressional plan, the District Court did not ignore any state-court judgment, but only because it had actively prevented such a judgment from issuing. The wrongfully entered December injunction prevented the Special Redistricting Panel from developing a contingent plan for congressional redistricting, as it had for legislative redistricting prior to the injunction. The state court's December order to the parties for mid-January submission of congressional plans was rendered a nullity by the injunction, which was not vacated until January 10. The net effect was a delay of at least a few weeks in the submissions to the state court, and in hearings on those submissions. A court may not acknowledge *Germano* in one breath and impede a state court's timely development of a plan in the next. It would have been appropriate for the District Court to establish a deadline by which, if the Special Redistricting Panel had not acted, the federal court would proceed. But the January 20 deadline that the District Court established here was explicitly directed *solely at the legislature*. The state court was never given a time by which it should decide on reapportionment, legislative *or* congressional, if it wished to avoid federal intervention.

Of course the District Court would have been justified in adopting its own plan if it had been apparent that the state court, through no fault of the District Court itself, would not develop a redistricting plan in time for the primaries.

*Germano* requires deferral, not abstention. But in this case, in addition to the fact that the federal court itself had been (through its injunction) a cause of the state court's delay, it nonetheless appeared that the state court was fully prepared to adopt a congressional plan in as timely a manner as the District Court. The Special Redistricting Panel received the same plans submitted to the federal court, and held hearings on those plans two days before the federal court issued its opinion. The record simply does not support a conclusion that the state court was either unwilling or unable to adopt a congressional plan in time for the elections.[2] What occurred here was not a last-minute federal-court rescue of the Minnesota electoral process, but a race to beat the Minnesota Special Redistricting Panel to the finish line. That would have been wrong, even if the Panel had not been tripped earlier in the course. The District Court erred in not deferring to the state court's timely consideration of congressional reapportionment.

### III

The District Court concluded that there was sufficient evidence to prove minority vote dilution in a portion of the city of Minneapolis, in violation of §2 of the Voting Rights Act of 1965, 42 U. S. C. §1973.[3] 782 F. Supp., at 439. Choosing not

---

[2] Although under Minnesota law legislative districts must be drawn before precinct boundaries can be established, see Minn. Stat. §204B.14, subd. 3 (Supp. 1991), congressional districts were not needed in advance of the March 3 precinct caucuses. Congressional district conventions did not take place until late April and early May.

[3] That section provides:

"(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

"(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes

to apply the preconditions for a vote-dilution violation set out by this Court for challenges to multimember districts, see *Thornburg* v. *Gingles,* 478 U. S. 30 (1986), the court instead proceeded directly to the "totality of circumstances" test in § 2(b) and found unlawful dilution.   It rejected, as a basis for its redistricting plan, Chapter 246, Chapter 246 as modified by Senate File 1596, and the state court's version of Chapter 246, and adopted instead its special masters' legislative plan, which includes a Senate district stretching from south Minneapolis, around the downtown area, and then into the northern part of the city in order to link minority populations.   This oddly shaped creation, Senate District 59, is 43 percent black and 60 percent minority, including at least three separately identifiable minority groups.[4]   In the District Court's view, based on "[j]udicial experience, as well as the results of past elections," a super-majority minority Senate district in Minneapolis was required in order for a districting scheme to comply with the Voting Rights Act.

leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.   The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."

[4] These percentages refer to total population.   To establish whether a § 2 violation has occurred (which presumably requires application of the same standard that measures whether a § 2 violation has been remedied) other courts have looked to, not the district's total minority population, but the district's minority population *of voting age.*   See, *e. g., Romero* v. *Pomona,* 883 F. 2d 1418, 1425–1426, and n. 13 (CA9 1989) (citing cases). *Gingles* itself repeatedly refers to the voting population, see, *e. g.,* 478 U. S., at 48, 50.   We have no need to pass upon this aspect of the District Court's opinion.

782 F. Supp., at 440. We must review this analysis because, if it is correct, the District Court was right to deny effect to the state-court legislative redistricting plan.

As an initial matter, it is not clear precisely which legislative districting plan produced the vote dilution that necessitated the super-majority remedy. For almost a decade prior to the 1992 election season, the only legislative districting plan that had been in use in Minnesota was the 1983 plan, which all parties agreed was unconstitutional in light of the 1990 census. More importantly, the state court had *declared* the 1983 plan to be unconstitutional in its final order of January 30. Once that order issued, the *Emison* plaintiffs' claims that the 1983 plan violated the Voting Rights Act became moot, unless those claims also related to the superseding plan. But no party to this litigation has ever alleged that either Chapter 246, or the modified version of Chapter 246 adopted by the state court, resulted in vote dilution. The District Court did not hold a hearing or request written argument from the parties on the § 2 validity of any particular plan; nor does the District Court's discussion focus on any particular plan.

Although the legislative plan that in the court's view produced the § 2 "dilution" violation is unclear, the District Court did clearly conclude that the state court's plan could not remedy that unspecified violation because it "fail[ed] to provide the affirmative relief necessary to adequately protect minority voting rights." *Id.*, at 448. The District Court was of the view, in other words, as the dissenting judge perceived, see *id.*, at 452, and n. 6 (MacLaughlin, J., concurring in part and dissenting in part), that *any* legislative plan lacking a super-majority minority Senate district in Minneapolis violated § 2. We turn to the merits of this position.

Our precedent requires that, to establish a vote-dilution claim with respect to a multimember districting plan (and

hence to justify a super-majority districting remedy), a plaintiff must prove three threshold conditions: first, "that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district"; second, "that it is politically cohesive"; and third, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U. S., at 50–51. We have not previously considered whether these *Gingles* threshold factors apply to a §2 dilution challenge to a single-member districting scheme, a so-called "vote fragmentation" claim. See *id.*, at 46–47, n. 12. We have, however, stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts, see, *e. g., id.,* at 47, and n. 13; *id.,* at 87 (O'CONNOR, J., concurring in judgment); *Rogers* v. *Lodge,* 458 U. S. 613, 616–617 (1982); see also *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966)—which is why we have strongly preferred single-member districts for federal-court-ordered reapportionment, see, *e. g., Connor* v. *Finch,* 431 U. S. 407, 415 (1977). It would be peculiar to conclude that a vote-dilution challenge to the (more dangerous) multimember district requires a higher threshold showing than a vote-fragmentation challenge to a single-member district. Certainly the reasons for the three *Gingles* prerequisites continue to apply: The "geographically compact majority" and "minority political cohesion" showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district, see *Gingles, supra,* at 50, n. 17. And the "minority political cohesion" and "majority bloc voting" showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population, see *Gingles, supra,* at 51. Unless these

points are established, there neither has been a wrong nor can be a remedy.[5]

In the present case, even if we make the dubious assumption that the minority voters were "geographically compact," there was quite obviously a higher-than-usual need for the second of the *Gingles* showings. Assuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with §2, when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential. See *Badillo* v. *Stockton*, 956 F. 2d 884, 891 (CA9 1992); *Concerned Citizens of Hardee County* v. *Hardee County Bd. of Comm'rs*, 906 F. 2d 524 (CA11 1990); *Campos* v. *Baytown*, 840 F. 2d 1240, 1244 (CA5 1988), cert. denied, 492 U. S. 905 (1989). Since a court may not presume bloc voting within even a single minority group, see *Gingles, supra,* at 46, it made no sense for the District Court to (in effect) indulge that presumption as to bloc voting within an agglomeration of distinct minority groups.

We are satisfied that in the present case the *Gingles* preconditions were not only ignored but were unattainable. As the District Court acknowledged, the record simply "contains no statistical evidence" of minority political cohesion (whether of one or several minority groups) or of majority bloc voting in Minneapolis. 782 F. Supp., at 436, n. 30. And even anecdotal evidence is lacking. Recognizing this void, the court relied on an article identifying bloc voting as a

---

[5] *Gingles* expressly declined to resolve whether, when a plaintiff alleges that a voting practice or procedure impairs a minority's ability to influence, rather than alter, election results, a showing of geographical compactness of a minority group not sufficiently large to constitute a majority will suffice. 478 U. S., at 46–47, n. 12. We do not reach that question in the present case either: Although the *Emison* plaintiffs alleged both vote dilution and minimization of vote influence (in the 1983 plan), the District Court considered only the former issue in reviewing the state court's plan.

42

national phenomenon that is "'all but inevitable.'" *Ibid.*, quoting Howard & Howard, The Dilemma of the Voting Rights Act—Recognizing the Emerging Political Equality Norm, 83 Colum. L. Rev. 1615, 1625 (1983). A law review article on national voting patterns is no substitute for proof that bloc voting occurred in Minneapolis. Cf. *Gingles*, 478 U. S., at 58–61 (summarizing statistical and anecdotal evidence in that case). Section 2 "does not assume the existence of racial bloc voting; plaintiffs must prove it." *Id.*, at 46.

\*　　\*　　\*

The District Court erred in not deferring to the state court's efforts to redraw Minnesota's state legislative and federal congressional districts. Its conclusion that the state court's legislative districting plan (which it treated as merely one available option) violated § 2 of the Voting Rights Act was also erroneous. Having found these defects, we need not consider the other points of error raised by appellants.

The judgment is reversed, and the case is remanded with instructions to dismiss.

*So ordered.*