The Honorable Herman G. Dillon State Representative, 32nd District State Capitol, Rm. 273-W Topeka, Kansas 66612
Dear Representative Dillon:
As Representative for the thirty-second district, you request our opinion regarding the proposed consolidation of the governments of the City of Kansas City and Wyandotte County. Specifically, you ask the following:
 1. Whether the Wyandotte County/Kansas City Consolidation Study Commission may expend $50,000 for the purpose of promoting the consolidation issue;
 2. Whether the elimination of elected offices as proposed by the study commission violates state law;
 3. Whether the commission districts proposed by the study commission comply with the provisions of the Voting Rights Act, 42 U.S.C.A §§ 1973 et seq.;
 4. Whether the House of Representatives can allow legislation to go before the voters without having an opportunity to debate or amend;
 5. Whether every city/county form of government has a right to have a consolidation study commission appointed by the Governor and $50,000 to fund the study;
 6. Whether the City of Kansas City and Wyandotte County can consolidate without legislative oversight; and
 7. Whether the procedure requiring both legislative bodies to reject the plan in order to keep it off the ballot is valid.
Through enactment of K.S.A. 1996 Supp. 12-340 et seq., the Kansas Legislature authorized the establishment of the Consolidation Study Commission of Kansas City, Kansas, and Wyandotte County. The purpose of the Commission was to prepare and adopt a plan addressing the consolidation of the City and County or certain City and County offices, functions, services and operations. K.S.A. 1996 Supp. 12-343.
Exercising its statutory authority, the Commission has submitted to the Legislature its consolidation study report dated January 13, 1997. Under the report, the Board of County Commissioners for Wyandotte County and the City Council and Mayor for the City of Kansas City would be replaced with a ten-member Unified Board of Commissioners and a Chief Executive/Mayor. The duties and functions of the City Clerk and County Clerk and the City Treasurer and County Treasurer would be consolidated into the positions of Unified Clerk and Unified Treasurer. The positions of Unified Clerk, Unified Treasurer, Public Administrator and Surveyor would be filled through appointment, rather than election. The offices of Sheriff, District Attorney and Register of Deeds would be retained as elected offices. In order to facilitate the election procedure proposed in the consolidation study report, the Commission provided that the persons currently serving as Sheriff and Register of Deeds would serve their terms of office through the scheduled end of the term in January, 2001, and until the election period held in April, 2001.
We begin with the question of expending public funds to promote an issue. The ability of a governmental body to engage in political activities was addressed in Attorney General Opinions No. 93-33 and 93-125. In these opinions, it was determined a local board of education and a city, respectively, had authority to expend public funds for the purpose of educating the electorate on an issue presented to it for a vote, but public funds could not be expended to promote or advocate the governing body's position on the issue.
 "It would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial, or autocratic governments but it cannot be tolerated, directly or indirectly, in these democratic United States of America. This is true even if the position advocated is believed to be in the best interest of our country. To educate, inform, to advocate or promote voting on any issue may be undertaken, provided it is not to persuade nor to convey favoritism, partisanship, partiality, approval or disapproval . . . of any issue, worthy as it may be." Attorney General Opinion No. 93-125, quoting Stern v. Kramarsky, 375 N.Y.S.2d 235, 239 (1975).
The Consolidation Study Commission was created by statute. K.S.A. 1996 Supp. 12-342.
The powers and duties of the Commission are set forth in K.S.A. 1996 Supp. 12-343 and 12-344. Its members, as well as its executive director, were appointed by the Governor pursuant to K.S.A. 1996 Supp. 12-342. Members of the Commission were entitled to receive compensation, subsistence allowances, mileage and other expenses as provided in K.S.A. 75-3223. K.S.A. 1996 Supp. 12-342. The executive director was to "receive compensation established by the governor, within the limits of appropriations for that purpose." Id. Compensation payable to other staff members was subject to approval by the Governor and limits of appropriations. Id. Funding for the Commission was derived from an appropriation to the Governor's office. The Consolidation Study Commission is a public entity, see 63A Am.Jur.2d Public Officers and Employees §§ 1, 2, 5, 9 (1984), possessing public funds. The public funds may be expended for the purpose of educating the electorate on the issue to be presented to it by the Consolidation Study Commission, or for encouraging members of the electorate to vote on the issue, but may not be expended for the purposes of advocating the position of the Consolidation Study Commission.
As noted previously, the report submitted by the Consolidation Study Commission proposes the consolidation of the City and County Clerk and City and County Treasurer positions into the positions of Unified Clerk and Unified Treasurer. While the County Clerk and County Treasurer positions were elected offices, the Unified Clerk and Unified Treasurer will be appointed positions. K.S.A. 1996 Supp. 12-344(b)(3) specifically allows the Commission to consider elimination of elective offices. The authority to eliminate public offices was the subject of Attorney General Opinions No. 88-5 and 95-114. Specifically, Attorney General Opinion No. 88-5 regarded whether the Governmental Organization Act, K.S.A. 12-3901 et seq., authorized the consolidation of the functions of the County Treasurer into a new office the holder of which would be appointed by the Board of County Commissioners, and whether elimination of the office of County Treasurer could occur prior to expiration of the term of office of the incumbent County Treasurer. Attorney General Opinion No. 95-114 reviewed the facial constitutionality of a Senate bill which would have the effect of shortening the terms of certain incumbent officers. After reviewing these opinions and relevant case law, it is our opinion that the elimination of an elective office through consolidation as proposed by the Consolidation Study Commission pursuant to K.S.A. 1996 Supp. 12-340 et seq. violates neither state law nor the rights of the office holder.
 "Holding public office in Kansas is deemed to be a political privilege that is subject to statutory enactment, except as otherwise limited by constitutional provisions. Goodrich v. Mitchell, 68 Kan. 765, 768-69, 772 (1904). The power of the legislature with respect to such appointments is supreme, except as limited by the constitution. Id. at 772; Schumacher v. Rausch, [190 Kan. 239, 244
(1962)] (that which is purely a creature of the legislature is subject not only to the legislative power to create, but also the legislative power to modify, dissolve, or abolish); see also Goodrich v. Mitchell, 68 Kan. at 769-70 (Kansas bill of rights, § 2 provides that no special privileges or immunities may be granted that may not be altered, revoked, or repealed by the same body; the legislature therefore may exercise judgment and discretion in the selection of officers without restriction). Thus, the legislature is free to abolish a public office or alter it in any manner, except to the extent its authority to do so is limited by the state or federal constitution. Attorney General Opinion No. 78-113." Attorney General Opinion No. 95-114.
The power of the legislature to modify, dissolve, or abolish an office exists whether the office holder is appointed or elected. See Attorney General Opinion No. 78-113 (the office of county treasurer is a statutory office, created by the legislature, which is free to abolish that office); 63A Am.Jur.2d Public Officers and Employees §§ 1, 156 (1984). The Legislature, therefore, may take action which would have the effect of eliminating the offices of county clerk and county treasurer as those offices presently exist in Wyandotte County. While Attorney General Opinion No. 88-5 provided that the elimination of the elected public office could not become effective until the expiration of the term of office to which the officer was elected, such determination was based on the fact that the elimination of the elected office was to be achieved by following a specific procedure established by state statute which called for completion of the term. In the situation addressed herein, the procedure set forth in K.S.A. 12-3901 et seq. is not being utilized in the elimination of the public offices. Rather, the elimination of the public offices is based on provisions of the consolidation study report in which the Commission exercised its authority under subsection (b)(3) of K.S.A. 1996 Supp. 12-344. Given the inapplicability of the restriction set forth in K.S.A.12-3904, the legislative action may take effect prior to the expiration of the terms of office for which the County Clerk and County Treasurer were elected.
As required under subsection (c) of K.S.A. 1996 Supp.12-343, the consolidation study report includes a map fixing the boundaries of the districts to be served by the ten members of the Unified Board of Commissioners. Eight of the commissioners will be elected from individual districts. The two "at-large" commissioners will be elected from a combination of the eight districts, with one at-large commissioner being elected from the four northern districts and the other being elected from the remaining four southern districts. In establishing the district boundaries, the Consolidated Study Commission attempted to meet the following objectives: 1. Keep traditional neighborhoods within one district; 2. Encompass each unified school district within one district; 3. Equalize as near as possible the population of each district; 4. Adhere to the 2% requirement used for city council districts; 5. Reflect ethnic make-up in the districts; and 6. Provide for equal representation as required by law. Consideration was also given to the State Representative districts. The result was the establishment of eight districts ranging in population from 19,763 to 20,672, with two of the districts being majority-minority districts.
The Voting Rights Act of 1965, 42 U.S.C.A. §§ 1973 et seq., and subsequent amending acts thereto, reflect the firm intention of the United States Congress to rid the country of racial discrimination in voting. See South Carolina v. Katzenbach, 383 U.S. 301, 315,15 L.Ed.2d 769, 86 S.Ct. 803 (1966). As provided in the Act:
 "(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in the contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this subsection.
 "(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C.A. § 1973.
If the state or political subdivision is one of those entities described in subsection (b) of 42 U.S.C.A. § 1973b, the state or political subdivision is required to seek advance clearance from the U.S. Attorney General or Department of Justice regarding any change or modification of any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting. 42 U.S.C.A. § 1973c.
The Voting Rights Act prohibits states and political subdivisions from participating in voter dilution, either through the creation of multi member districts in which the voting strength of racial minorities is minimized or canceled out by majority voters, or through manipulation of district boundaries such that minority voters are fragmented among several districts where a bloc-voting majority can routinely out-vote them, or are packed into one or a small number of districts to minimize their influence in other districts. See Thornburg v. Gingles, 478 U.S. 30, 44-45,92 L.Ed.2d 25, 106 S.Ct. 2752 (1986); Voinovich,122 L.Ed.2d at 511. The Act contains no per se prohibitions against particular types of districts, but rather focuses exclusively on the consequences of apportionment. Only if the apportionment scheme has the effect of denying a protected class the equal opportunity to elect its candidate of choice does it violate subsection (a) of 42 U.S.C.A. § 1973; where such an effect has not been demonstrated, the Act simply does not speak to the matter. Voinovich, 122 L.Ed.2d at 512.
In order to sustain a claim of voter dilution, the three threshold conditions announced in Gingles must be proven by the claimants:
 "First, they must show that the minority group `"is sufficiently large and geographically compact to constitute a majority in a single-member district."'
 Second, they must prove that the minority group `"is politically cohesive."'
 Third, the plaintiffs must establish `"that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."' Growe, 507 U.S., at ___, 122 L.Ed.2d 388, 113 S.Ct. ___ (quoting Gingles, supra, at 50-51, 92 L.Ed.2d 25, 106 S.Ct. 2752)." Voinovich, 122 L.Ed.2d at 513-14.
If the preconditions are proven, the districts are then reviewed under the "totality of the circumstances." Johnson v. DeGrandy, 512 U.S. ___, 129 L.Ed.2d 775,790-91, 114 S.Ct. 2647 (1994); African-American Affairs v. McWherter, 877 F. Supp. 1096, 1099-100 (W.D.Tenn. 1995). To assist courts in evaluating the totality of the circumstances, the Senate Judiciary Committee listed several factors in the legislative history of the 1982 amendments to the Voting Rights Act. See S.Rep. No. 417, 97th Cong., 2d Sess. 28-29, reprinted in 1982 U.S.C.C.A.N. 177, 206-07.
The Consolidation Study Commission established eight districts from which members of the Unified Commission would be elected. Two of the districts — District 1 and District 4 — are majority-minority districts. The remaining districts include minority populations as follows: District 2 — 29.1%; District 3 — 28.3%; District 5 — 19%; District 6 — 8.1%; District 7 — 13.8%; and District 8 — 31.8%. The two at-large districts include minority populations of 47.8% for the north district and 18% for the south district. The establishment of the districts in this manner does not per se violate the Voting Rights Act. Neither Wyandotte County nor Kansas City, Kansas, is required to seek advance clearance for any change or modification of any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting. Because no factual conclusions supporting the Gingles threshold conditions have been submitted, and advance clearance of the district boundaries is not required, it appears the present configuration of Unified Commission districts does not violate the Voting Rights Act.
You question whether the House of Representatives may allow legislation to go before voters without an opportunity for debate or amendment. You also point out that if the House rejects the proposal and the Senate does not take any action on it, or vice versa, it still would go on the ballot on April 1, 1997 because K.S.A. 1996 Supp. 12-343(f) requires both houses of the Legislature to reject the plan in order to preclude it from being placed on the ballot. We address these two issues together. K.S.A. 1996 Supp. 12-343(f) provides in part as follows:
 "Unless the legislature, by concurrent resolution adopted on or before February 12, 1997, the 30th day of the 1997 regular session, rejects such plan, the plan shall be submitted to the qualified electors of the county at the school district general election on April 1, 1997."
The first of these questions assumes that the plan, as recommended by the Study Commission, is going to be placed before the Legislature in bill form. In fact, what K.S.A. 1996 Supp. 12-343(f) calls for is a concurrent resolution to reject the plan. We believe this provision is unconstitutional, and therefore invalid, in light of the Kansas Supreme Court's decision in State ex rel. Stephan v. Kansas House of Representatives, 236 Kan. 45 (1984). In that case, the Court was asked to rule upon the validity of provisions then existing in K.S.A. 77-426 of the Rules and Regulations Filing Act. The provisions in question allowed the Legislature to reject administrative rules and regulations by concurrent resolution. The Court said:
 "We are persuaded by our analysis of the law in this state and a review of the above-discussed decisions that the legislative veto mechanism contained in subsections (c) and (d) of K.S.A. 1983 Supp. 77-426
violates not only the separation of powers doctrine but also the presentment requirement contained in art. 2, Sec. 14 of our state constitution. As made clear by the court in Chadha, a resolution is essentially legislative where it affects the legal rights, duties and regulations of persons outside the legislative branch and therefore must comply with the enactment provisions of the constitution. 103 S.Ct. at 2784. See also State v. A.L.I.V.E. Voluntary, 606 P.2d at 773-74. Where our legislature attempts to reject, modify or revoke administrative rules and regulations by concurrent resolution it is enacting legislation which must comply with the provisions of art. 2, Sec. 14. A bill does not become a law until it has the final consideration of the house, senate and governor as required by art. 2, Sec. 14. Harris v. Shanahan, 192 Kan. 183, Syl. Sec. 1, 387 P.2d 771
(1963). This was not done here.
 "The fact that K.S.A. 1983 Supp. 77-426 was passed in accordance with the provisions of art. 2, Sec. 14 of our state constitution and the governor had the opportunity to veto it does not render subsequent acts of the legislature under the statute constitutional. The legislature cannot pass an act that allows it to violate the constitution. General Assembly of State of New Jersey v. Byrne, 90 N.J. at 391, 448 A.2d 438."
Like the rule and regulation authority discussed in the above-quoted case, the authority to prepare and adopt a plan addressing consolidation was statutorily granted to a separate governmental entity, the newly created Consolidation Study Commission. The statute passed in 1996 allows for submission of the plan as adopted to an election in April of 1997. As stated in the Court's opinion, once those authorities were granted, the only way the legislature may remove or alter the authority is by bill, voted on by both houses of the Legislature and presented to the Governor. Thus, in our opinion, the provision giving the Legislature "veto authority" by concurrent resolution is invalid. In order for the Legislature to prevent the plan from being placed on the ballot in April, a bill to do so must be passed by both Houses and presented to the Governor pursuant to article 2, sections 13 and 14 of the Kansas Constitution.
You question whether K.S.A. 1996 Supp. 12-340 et seq. establishes a precedent so that every city/county form of government will be entitled to have a consolidation study commission appointed by the Governor and $50,000 of state money to fund the study. We see no requirement in the act or elsewhere for the state to create and fund study commissions for each and every city/county government.
You question whether the City of Kansas City and Wyandotte County could consolidate without legislative oversight. This question is answered by our response to your questions regarding the legislative procedure established by K.S.A. 1996 Supp. 12-343(f). K.S.A. 1996 Supp. 12-340 et seq. grants to the City and County, in the form of a referendum, the authority to determine the issue of consolidation and the Legislative oversight set forth in K.S.A. 1996 Supp. 12-343 is of no effect. But just as any other authority given local units of government by legislation, the authority granted may be taken away if done so by bill passed by both houses and presented to the Governor. We do not here address the issue of whether the City and County may effect consolidation by home rule. Because there is a statutory enactment in place and that is what is currently in question, the issue of home rule is hypothetical and not before us.
In conclusion, public funds may be expended for the purpose of educating the electorate on the issue to be presented to it by the Consolidation Study Commission, or for encouraging members of the electorate to vote on the issue, but may not be expended for the purposes of advocating a particular position. The legislative veto authority established by K.S.A. 1996 Supp. 12-343(f) is invalid.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Julene L. Miller Deputy Attorney General
 Richard D. Smith Assistant Attorney General
CJS:JLM:RDS:jm