PETERSON, Bart, et al., Appellants,

v.

BORST, Philip C., Appellee.

Boyd, Rozelle, et al., Appellants,

v.

Sadler, Doris Anne, et al., Appellees.

No. 49S02–0302–CV–71.

Supreme Court of Indiana.

March 27, 2003.

William R. Groth, Geoffrey S. Lohman, A. Scott Chinn, Anthony W. Overholt, April E. Sellers, Fred R. Biesecker, Michael A. Wukmer, Indianapolis, IN, Attorneys for Appellants.

William Bock, III, Mark J. Colucci, Matthew T. Klein, Indianapolis, IN, Attorneys for Appellee.

Edward W. Harris, III, Maggie L. Smith, Thomas F. O'Gara, Indianapolis, IN, Attorneys for Amicus Curiae.

## ON PETITION FOR REHEARING

PER CURIAM.

Appellee, Councillor Philip C. Borst, seeks rehearing following our *per curiam* opinion in *Peterson v. Borst,* 786 N.E.2d 668 (Ind.2003). In that opinion, we adopted a redistricting plan for the City–County Council of the City of Indianapolis and Marion County, Indiana ("Council"), as part of our appellate review of the trial court judgment entered pursuant to Indiana Code § 36–3–4–3(d) (1998). Councillor Borst seeks rehearing on four issues.

### Voting Rights Act

The petition for rehearing first asserts that the redistricting plan this Court adopted is impermissibly racially discriminatory because it provides too few council districts in which African–Americans constitute a majority of the population. It contends that the Court's plan thus "subjects Marion County to the very real possibility of a successful [Federal] Voting Rights Act suit." Appellee's Petition for Rehearing at 7.

■ The relevant portions of Section 2 of the Voting Rights Act provide:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice....

42 U.S.C. § 1973. Section 2 of the Voting Rights Act does not apply on its face to court-drawn redistricting plans, but

"courts should comply with the section when exercising their equitable powers to redistrict." *Abrams v. Johnson*, 521 U.S. 74, 90, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997).

The petition for rehearing stops short of explicitly alleging a violation of the Voting Rights Act, yet it undertakes to show how, in Voting Rights Act litigation parlance, two "vote dilution" claims could be made against the Court's plan. The petition first suggests a "dispersal" claim, alleging that by drawing district boundaries as we did, Marion County's African–American population was dispersed among the twenty-five districts to such a degree that its ability to elect candidates of its choice will be impermissibly diluted. *See Voinovich v. Quilter*, 507 U.S. 146, 153, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (dividing a minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice). Next, the petition for rehearing suggests a different type of vote-dilution claim, a "packing" claim alleging that African–Americans have been improperly packed into one district, whose population is 76.1% African–American. *See Johnson v. De Grandy*, 512 U.S. 997, 1007, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (vote dilution can occur not only by fragmenting minority voters among several districts, but also by packing them into one or a small number of districts to minimize their influence in nearby districts).

■ In drawing the districts in the Court's plan, we utilized only the statutory factors of compactness, equality of population, and adherence to precinct boundaries. *See* I.C. § 36–3–4–3(a). While drawing the district boundaries, we did not consider the African–American, Hispanic, or other minority group population in each district, nor did we try to achieve any particular number of majority-minori-

ty districts. After we completed drawing the districts' boundaries, we did examine the minority population of the districts and discovered the following: three of the twenty-five districts had an African–American population of 50% or more and four additional districts had an African–American population of roughly 40% or more. Also, we observed that the Court's plan resulted in eleven districts where African–Americans make up 25% or more of the population.

This Court's redistricting plan conforms to the requirements of the Voting Rights Act. First and foremost, by drawing our own district boundaries in the way described above and not adopting a plan put forth by either political party, we adopted a plan in which race was not a motive whatsoever in creating the districts.

■ Second, a vote-dilution claim cannot succeed without a threshold showing that: 1) the minority group at issue is sufficiently large and geographically compact to constitute a district; 2) the minority group is politically cohesive; and 3) the "majority 'votes sufficiently as a bloc to enable it … to defeat the minority's preferred candidate.'" *Abrams*, 521 U.S. at 91, 117 S.Ct. 1925 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)). Once these three showings are made by a plaintiff, a court must consider whether, under the totality of circumstances, minority voters have been denied an equal opportunity to participate in the political process and elect representatives of their choice. *Id.* (citing 42 U.S.C. § 1973(b)).

■ The petition for rehearing suggests specifically that the Court's redistricting plan is susceptible to a "dispersal" claim under the Voting Rights Act because the plan results in only three majority-minority districts rather than the seven

that have existed for the past decade. It contends that the number of majority-minority districts should not have been reduced. However, a reduction in the total number of majority-minority districts does not necessarily dilute minority voting rights. And the Voting Rights Act does not require that a redistricting entity create as many majority-minority districts as possible. *See De Grandy,* 512 U.S. at 1017, 114 S.Ct. 2647. Significantly here, there has been no showing that the white population votes sufficiently as a bloc to enable it to defeat the preferred candidate of the African–Americans in the four, roughly 40% districts that we described above.[1] Racially polarized bloc voting may not be presumed under Section 2 of the Voting Rights Act; it must be proven. *Growe v. Emison,* 507 U.S. 25, 41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993).

We conclude that a "packing" claim under the Voting Rights Act would fare no better. The Court's plan does not limit the electoral influence of African–American voters by cramming them into one or a small number of districts; on the contrary, the plan results in eleven districts with African–American populations of 25% or greater.

Absent any showing that the Court's redistricting plan runs afoul of the principles set forth in the Voting Rights Act, we decline to reconfigure the district boundaries that the race-neutral criteria in Indiana Code § 36–3–4–3(a) produced.

### Discrimination on the Basis of Political Affiliation

■ The petition for rehearing asserts that this Court's rejection of plan proposed by Councillor Borst discriminates on the basis of political affiliation in violation of the First and Fourteenth Amendments to the United States Constitution. *See* Appellee's Petition for Rehearing at 7. Specifically, the petition argues: "The Court's reliance on the partisan affiliation of supporters of a proposed redistricting plan to find the plan invalid constitutes political discrimination under the federal constitution." Appellee's Petition for Rehearing at 7. No authority is cited for this claim and we think it has no merit. Parties are of course free to associate and present their contentions to the court. The error was in the Superior Court's adoption of a partisan plan, not in the parties' presenting one.

The petition for rehearing contends that this Court's rejection of a remedy advanced by members of one political party "conflicts with the long standing practice of virtually every court that has ever considered such matters." *See* Appellee's Petition for Rehearing at 9. Our decision, however, finds support in both federal and state cases, including two recent state supreme court decisions. *See, e.g., Corbett v. Sullivan,* 202 F.Supp.2d 972 (E.D.Mo. 2002); *Prosser v. Elections Bd.,* 793 F.Supp. 859 (W.D.Wis.1992); *In re Legislative Districting of State,* 370 Md. 312, 805 A.2d 292 (2002); *Burling v. Chandler,* 148 N.H. 143, 804 A.2d 471 (2002).

We do not suggest that it is error for a court to give thoughtful consideration to plans offered by parties to a redistricting dispute. A court, however, must also consider all the circumstances of the dispute and determine whether adoption of one of the plans would improperly introduce political considerations into the judicial process.

---

**1.** Although the trial court made numerous factual findings relating to concerns over the Voting Rights Act, it did not make any finding that white voters in Marion County vote sufficiently as a bloc to enable them to defeat the candidate preferred by African–American voters. *See* Appellants' Appendix at 48–50, 64–67.

### Participation by Justice Boehm

Councillor Borst filed a motion requesting that Justice Boehm recuse himself from participation in this case. As is this Court's practice, the matter was referred to the Justice to whom the recusal request was directed, and on March 17, 2003, Justice Boehm issued a published opinion stating his reasons for declining to recuse himself. *See Peterson v. Borst,* 784 N.E.2d 934 (Ind.2003). The petition for rehearing now asks the full Court to reconsider this issue.

We regard decisions to recuse as being in the hands of individual Justices, subject to review by others under only the most extreme circumstance, which the present instance is not.

### Due Process

The petition for rehearing contends that this Court violated due process rights by usurping the redistricting role the legislature delegated to the Superior Court, by formulating its own redistricting plan without conducting a hearing or providing an opportunity for comment, and by eliminating the right to appeal the redistricting plan under Indiana Code § 36-3-4-3. These contentions seem to be elaborations on the earlier argument that drawing new Council district boundaries is beyond this Court's appellate jurisdiction over this dispute. We fully considered this issue in our original opinion and stand by our conclusion that we did not overstep our jurisdictional bounds.

■ The petition for rehearing further contends that this Court erred by ordering supplementation of the record with data that was not part of the record before the trial court. The petition does not, however, specify which of the requested data was not part of the record below, which of this data the petitioner objects to, or how consideration of this data prejudiced him. We note that this Court used the database submitted by Councillor Borst in formulating its redistricting plan.

### Conclusion

For the reasons above, we deny Appellee's Petition for Rehearing.

SHEPARD, C.J., and DICKSON, SULLIVAN, and BOEHM, JJ., concur.

RUCKER, J., concurs with a separate opinion.

RUCKER, J., concurring.

I agree that Councilor Borst's petition for rehearing should be denied. I write separately to explore further his contention that "[t]he redistricting plan adopted by [this] Court is racially discriminatory." Pet. for Reh'g at 2. Underlying this contention is the fact that the three majority African–American districts resulting from this Court's redistricting plan are not proportional to the percentage of the African–American population in Marion County. Councilor Borst argues that because the African–American population in the county is approximately 24%, that same approximate percentage should be reflected in the number of majority African–American districts. Essentially, according to Councilor Borst, out of a total of 29 districts, there should be 7 majority African–American districts as opposed to 3.

Councilor Borst's claim implicates Section 2 of the Federal Voting Rights Act. He does not complain that the Court's plan actually violates the Act. Rather, he contends "[t]he failure of the Supreme Court Plan to address minority representation concerns ... dilutes minority voting strength in Marion County and subjects Marion County to the very real possibility of a successful Voting Rights Act suit." Pet. for Reh'g at 7.

Congress enacted Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall "be denied or abridged ... on account of race, color, or previous condition of servitude." *Voinovich v. Quilter*, 507 U.S. 146, 152, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (quoting U.S. Const., amend. XV). Section 2(a) of the Act prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." Section 2(b) dictates in relevant part that Section 2(a) is violated if:

> [B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). Section 2 thus prohibits any practice or procedure that "interacting with social and historical conditions," impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters. *Voinovich*, 507 U.S. at 153, 113 S.Ct. 1149 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)).

One such practice or procedure is commonly referred to as "vote dilution" which may be caused either "by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46, n. 11, 106 S.Ct. 2752. To prevail on a Section 2 vote dilution claim, the plaintiff must first establish three threshold conditions: (1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997). These three conditions are generally referred to as the *"Gingles"* test. *See Gingles*, 478 U.S. at 50–51, 106 S.Ct. 2752.[2]

In this case a credible argument can be made that at least the first prong of the *Gingles* test has been met. "When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the *possibility* of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (emphasis added). (reversing in part the judgment of a three-judge court that created a plan that provided for 11 reasonably compact districts, each with a voting age population of at least 64% Hispanic, while rejecting a plan that provided for 9 districts). The *Johnson* Court further observed "attaching the labels 'packing' and 'fragmenting' ... without more, does not make the result vote dilution when the minority group enjoys *substantial proportionality*." *Id.* at 1015–16, 114 S.Ct. 2647 (emphasis added).[3]

---

**2.** Although each element in this three-part test must be proven, standing alone they will not suffice to establish a Section 2 violation. Rather, "[t]he plaintiff must also demonstrate that the totality of the circumstances supports a finding that the voting scheme is dilutive." *Bossier Parish Sch. Bd.*, 520 U.S. at 480, 117 S.Ct. 1491.

**3.** Defining "proportionality" as the link between "the number of majority-minority vot-

Although the Voting Rights Act does not require courts to "maximize" the number of districts in which minority voters may elect candidates of their choice, *id.* at 1017, 114 S.Ct. 2647, the link between majority-minority districts to minority members' share of the relevant population, is *"always* relevant evidence in determining vote dilution, but is *never* itself dispositive." *Id.* at 1025, 114 S.Ct. 2647 (O'Connor, J., concurring).

As the majority here correctly points out, "[i]n drawing districts in the Court's plan, we utilized only the statutory factors of compactness, equality of population, and adherence to precinct boundaries. *See* I.C. § 36–3–4–3(a). While drawing the district boundaries, we did not consider the African–American, Hispanic, or other minority group population in each district, nor did we try to achieve any particular number of majority-minority districts." Op. at 462. However, in drawing the maps as we did, I acknowledge that it resulted in African–American voters not forming an effective majority in the percentage of districts in reasonable proportion to their percentage in the relevant population.

Nonetheless, this does not mean the votes of African–Americans necessarily have been diluted. There must also be proof that "the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. 2752. Although there was testimony before the *en banc* court of "racially polarized voting" in Marion County, it is instructive that the court made no such factual finding. And that is not surprising. The public record shows that the Honorable Julia Carson, an African–American, has been elected as a

Representative to the United States Congress four times from a district that includes most of Marion County; Karen Freeman–Wilson, an African–American candidate for the 2000 state Attorney General's race, outpolled her white challenger in Marion County; Frank Anderson, an African–American candidate for Marion County Sheriff in 2002, outpolled his white challenger with 66.9% of the vote; and in Pike Township, where African–American voters are in the minority, 3 out of 4 township officials elected in 2002 were African–American.

Although the lack of proportionality may suggest vote dilution, a history of electoral success cuts the other way.

> If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice.

*Johnson,* 512 U.S. at 1020, 114 S.Ct. 2647. At least in recent years, the African–American community in Marion County has consistently demonstrated its political sophistication in electing candidates of their choice on an equal basis with other voters, despite being a minority of the population in the overall community. That is not to suggest that racism in Marion County politics necessarily has been eliminated, but it does support the view that the necessity of intentionally creating a particular and discreet number of majori-

---

ing districts to minority members' share of the relevant population." *Johnson,* 512 U.S.

at 1014, n. 11, 114 S.Ct. 2647.

ty-minority districts may no longer be required.

In this case Councilor Borst simply has not demonstrated that this Court's redistricting plan dilutes African–American voting strength and thus may violate section 2 of the Voting Rights Act.[4] The majority has denied his petition for rehearing and with the foregoing additional understanding, I concur.

---

4. I find it also instructive that no African–American voter, or any organization historically involved in advancing the interests of the African–American community, has sought *Amicus* status in this case to embrace the Councilor Borst position.