Rev. Olen ARRINGTON, Jr., Alvin Baldus, Stephen H. Braunginn, John D. Buenker Robert J. Cornell, V. Janet Czuper, Levens de Back, Steven P. Doyle, Anthony S. Earl, James A. Evans, Dagoberto Ibarra, John H. Krause, Sr., Joseph J. Kreuser, Frank L. Nikolay, Melanie R. Schaller, Angela W. Sutkiewicz, and Ollie Thompson, Plaintiffs,

and

James R. Baumgart, Roger M. Breske, Brian T. Burke, Charles J. Chvala, Russell S. Decker, Jon Erpenbach, Gary R. George, Richard Grobschmidt, Dave Hansen, Robert Jauch, Mark Meyer, Rodney Moen, Gwendo-

lynne S. Moore, Kimberly Plache, Fred A. Risser, Judy Robson, Kevin W. Shibilski, and Robert D. Wirch, each individually and as members of the Wisconsin State Senate, Intervenor–Plaintiffs,

v.

ELECTIONS BOARD, an independent agency of the State of Wisconsin, John P. Savage, its chairman, and each of its members in his or her official capacity, David Halbrooks, Don M. Millis, Randall Nash, Gregory J. Paradise, Catherine Shaw, Judd David Stevenson, Christine Wiseman, and Kevin J. Kennedy, its executive director, Defendants,

and

Scott R. Jensen, in his capacity as the Speaker of the Wisconsin Assembly, and Mary E. Panzer, in her capacity as the Minority Leader of the Wisconsin Senate, Intervenor–Defendants.

No. 01–C–121.

United States District Court, E.D. Wisconsin.

Nov. 28, 2001.

LaFollette Godfrey & Kahn, Madison, WI, by Brady C. Williamson, Mike B. Wittenwyler, Godfrey & Kahn, Milwaukee, WI, by Howard Pollack, for Plaintiffs.

Boardman, Suhr, Curry & Field, Madison, WI, by Michael P. May, James E. Bartzen, for Intervening Plaintiffs.

Wisconsin Department of Justice by Assistant Attorney General Thomas J. Balistreri, for Defendant.

Michael Best & Freidrich, Madison, WI, by James R. Troupis, Eric M. McLeod, Gordon P. Giampietro, for Intervening Defendants.

Before EASTERBROOK, Circuit Judge, STADTMUELLER, Chief District Judge, and REYNOLDS, Senior District Judge.[1]

1. This three-judge district court panel has been convened pursuant to 28 U.S.C. § 2284.

(*See* n. 4, *infra,* and accompanying text.)

## MEMORANDUM OPINION AND ORDER

STADTMUELLER, Chief Judge.

Under Article I, Section 2 of the United States Constitution, congressional representatives shall be apportioned among the several states according to population, as determined by a decennial census. The Bureau of the Census, U.S. Department of Commerce ["the Census Bureau"], conducted the required decennial census of Wisconsin—and all other states—during the first part of last year. On December 28, 2000, the Census Bureau certified the population of Wisconsin to be 5,471,210 as of April 1, 2000, and the population of the United States as a whole to be 281,424,188. Distributing the 435 representatives authorized by law among the 50 states, then, Wisconsin is presently entitled to 8 representatives (one for every 646,952 people). In previous years the state was entitled to nine.[2]

Under the congressional districting law enacted by the Wisconsin Legislature in 1991 and codified in Wis. Stat. § 3.001,[3] the voters of the state of Wisconsin are assigned to one of nine congressional districts. Unless the law is changed or enjoined, its now-outdated provisions will govern the upcoming 2002 congressional elections. Cf. Hastert v. State Bd. of Elections, 777 F.Supp. 634, 637 (N.D.Ill.1991)(noting a similar problem arising in Illinois in 1991). Concerned voters from Wisconsin's nine congressional districts filed suit in the federal district court for the Eastern District of Wisconsin on February 1, 2001, to address the situation. These voters seek a declaratory judgment that the current apportionment plan is unconstitutional, an injunction barring administration of elections under that plan and, in the absence of subsequent action by state legislators, the institution of a judicially-crafted redistricting plan.

On February 5, 2001, the State Senate Democratic Caucus moved to intervene to expand the action to include the reapportionment of the state legislative districts. On February 8, 2001, Chief Judge Joel M. Flaum of the Seventh Circuit Court of Appeals, acting pursuant to 28 U.S.C. § 2284(b)(1), appointed Circuit Court Judge Frank H. Easterbrook, Chief District Court Judge J.P. Stadtmueller, and Senior District Court Judge John W. Reynolds to a three-judge district court panel to preside over the action.[4] Then, on February 21, 2001, State Assembly

---

**2.** While Wisconsin's population increased 9.2% over its 1990 levels, it did not increase as much as the population in several other states. This relative disparity in growth caused some states (such as Wisconsin) to lose representatives after apportionment of the 435 representatives, and other states to gain.

**3.** Wis. Stat. § 3.001 (1999–2000) reads:

Based on the certified official results of the 1990 census of population (statewide total: 4,891,769) and the allocation thereunder of congressional representation to this state, the state is divided into 9 congressional districts as nearly equal in population as practicable. Each congressional district, containing approximately 543,530 persons, shall be entitled to elect one representative in the congress of the United States.

Additional sections of Wisconsin Statutes, Chapter 3, apportion the residents of the state of Wisconsin to specific geographic districts.

**4.** Procedurally, the Clerk of Court for the Eastern District of Wisconsin randomly assigned the case to Judge Reynolds immediately upon its filing on February 1, 2001. Noting the plaintiffs' invocation of 28 U.S.C. § 2284 (which calls for three-judge panels in legislative apportionment litigation), Judge Reynolds contacted Judge Flaum on February 2, 2001, to request the assignment of two additional judges. Acting pursuant to 28 U.S.C. § 2284(b)(1), Judge Flaum randomly assigned Judges Easterbrook and Stadtmueller to the case on February 5, 2001.

Speaker Scott Jensen and State Senate Minority Leader Mary Panzer moved to intervene regarding the redistricting of the congressional districts (though they have not yet moved to join in the proposed redistricting of the state legislative districts).

The United States Supreme Court has interpreted Article I, Section 2 of the United States Constitution as delegating to the states the "primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). Considering that the state legislature had not yet attempted to create a constitutional apportionment plan (indeed, had not yet had the opportunity to do so), Judge Reynolds on February 28, 2001, ordered all interested parties to submit briefs addressing the potential lack of a justiciable case or controversy.[5] The plaintiffs, intervenor plaintiffs, and intervenor defendants submitted briefs arguing that such a case or controversy does, in fact, exist. The defendants took no position on the matter.

It is the determination of this court that the complaint as filed does present a justiciable case or controversy. The case or controversy requirement of Article III of the United States Constitution confines the federal courts to resolving " 'real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of the facts.' " *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)(quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971))(quoting, in turn, *Aetna Life Ins.*

*Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). Thus, to determine whether a justiciable case or controversy exists, it is important to identify clearly the injury that the plaintiffs claim and the relief that they seek.

In their complaint, the plaintiffs allege that shifts in population and population growth have rendered the nine Wisconsin congressional districts established by law in 1991 no longer as equal in population as required by the United States Constitution. Specifically, they allege that the plaintiffs who reside in the 1st, 2nd, 6th, 8th, and 9th Congressional Districts, based on the current district lines, are particularly under-represented in comparison with residents of other districts. They further allege that the absolute reduction in the number of congressional representatives for Wisconsin in the United States House of Representatives renders the state malapportioned and its citizens misrepresented. *(See* Compl. at 10–11.) They seek a declaration that the apportionment of Wisconsin's nine congressional districts in Chapter 3 of the Wisconsin Statutes is unconstitutional, an injunction barring the state Elections Board from administering elections according to Chapter 3 of the Wisconsin Statutes, and, in the absence of an amended state law, establishment of a judicial plan of apportionment to make the state's eight new congressional districts as nearly equal in population as practicable. *(See id.* at 13–14.) To be very clear, then, the plaintiffs do *not* address their complaint to any apportionment scheme the state legislature may enact in the future. Doing so obviously would fail the case or controversy test. *See Illinois v. City of Chicago*, 137 F.3d 474, 477 (7th Cir.1998)(parties may not "litigate about

---

**5.** Article III, Section 2 of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies," pre-

venting courts from engaging in premature review of issues.

laws not yet enacted, indeed not yet introduced").

Complaints such as the one filed in this court are not uncommon.[6] *See, e.g., Growe v. Emison, supra* (addressing a lawsuit alleging claims nearly identical to those in this case); *Flateau v. Anderson,* 537 F.Supp. 257 (S.D.N.Y.1982)(same). *See also, AFL–CIO v. Elections Bd.,* 543 F.Supp. 630 (E.D.Wis.1982); *Prosser v. Elections Bd.,* 793 F.Supp. 859 (W.D.Wis.1992)(previous cases where federal courts in Wisconsin have become involved in the redistricting of legislative districts). *See also, Korman v. Giambra,* No. 01–CV–369 (W.D.N.Y. filed May 24, 2001); *Hastert v. State Bd. of Elections,* No. 91–CV–4028 (N.D. Ill. reopened June 1, 2001)(cases challenging state apportionment laws based on the results of the 2000 census). Such suits are prevalent because existing apportionment schemes become "instantly unconstitutional" upon the release of new decennial census data. Pamela S. Karlan, *The Right to Vote: Some Pessimism about Formalism,* 71 Tex. L.Rev. 1705, 1726 (1993). *See also* Note, *Federal Court Involvement in Redistricting Litigation,* 114 Harv. L.Rev. at 878 ("The 2000 census, like each prior census, will indicate not only changes in overall population size but also changes in population distribution .... These population shifts will render federal, state, and local district maps unconstitutional under the one person, one vote requirement."). This unconstitutionality derives from Article I, Section 2 of the United States Constitution, which requires legislative districts to be as equipopulous as possible. *See Kirkpatrick v. Preisler,* 394 U.S. 526, 530–31, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). *Cf. Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct.

1362, 12 L.Ed.2d 506 (1964)(each individual's vote must count equally as each other person's vote). Since it is impossible for legislative districts to remain equipopulous from decade to decade, challenges to districting laws may be brought immediately upon release of official data showing district imbalance—that is to say, "*before* reapportionment occurs." Karlan, *supra,* 71 Tex. L.Rev. at 1726 (emphasis in original). *See also* 114 Harv. L.Rev. at 879 ("When the census reveals existing districts to be unconstitutional, political parties ... can immediately sue to have the existing district declared unconstitutional.").

■ Simply because an election law has become unconstitutional does not necessarily mean a federal court should step in to rewrite it, however. Indeed, the Supreme Court has been very clear in stating that "[a]bsent evidence that [the] state branches will fail timely to perform [their] duty [to enact redistricting legislation], a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe,* 507 U.S. at 34, 113 S.Ct. 1075. Thus, this court should stay its proceedings until some reasonable deadline. *See Scott v. Germano,* 381 U.S. 407, 409, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965)(*per curiam* ); *Growe,* 507 U.S. at 36, 113 S.Ct. 1075.

■ It might be suggested that instead of staying proceedings, the court should dismiss the case altogether for lack of standing or lack of "ripeness." This is because the Wisconsin State Legislature itself may rewrite Chapter 3 of the Wisconsin Statutes before the start of the upcoming primary season, in which case the plaintiffs will not suffer any actual injury from the unconstitutionality of the

---

**6.** Indeed, following the 1980 census, federal courts oversaw roughly one-third of all congressional and state legislative redistricting; following the 1990 census, there was redistricting litigation in forty-one of the fifty states. Note, *Federal Court Involvement in Redistricting Litigation,* 114 Harv. L.Rev. 878, 879 (2001).

state's current districting laws.[7] As injury is a component of Article III jurisdiction, the court will consider this suggestion further.

While the exact contours of the Article III case or controversy requirement may be indistinct at best, *see Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), all commentators agree that a plaintiff must show an "injury in fact" before the Constitution will allow a federal court to retain jurisdiction over his complaint, *see Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 218, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)("whatever else the 'case or controversy' requirement embodie[s], its essence is a requirement of 'injury in fact' ")(quoting *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). If one cannot show injury, one either lacks standing to bring suit, *see Arizonans for Official English v. Arizona,* 520 U.S. 43, 63–64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), or one's lawsuit is not yet "ripe," [8] *see Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 491, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). While inextricably intertwined, the standing and ripeness doctrines pose slightly different questions.

The standing inquiry focuses on the parties. The key issue here is whether the plaintiff is a proper party to maintain the action—that is to say, whether the plaintiff who seeks to invoke the judicial power actually stands to profit in some personal interest. *See Allen,* 468 U.S. at 765, 104 S.Ct. 3315. The most natural way a litigant may stand to benefit from judicial intervention is if he is in imminent danger of suffering an injury the court is capable of preventing. *See generally, Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(discussing imminence).

Courts consistently find that plaintiffs alleging injury to their voting rights have standing to bring suit. *See* Karlan, 71 Tex. L.Rev. at 1726–27. To achieve standing, all one needs to do is allege a "threat" that one's voting rights may be diluted. *See Department of Commerce v. United States House of Representatives,* 525 U.S. 316, 331–32, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999). *See also, Federal Election Comm'n v. Akins,* 524 U.S. 11, 25, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (recognizing that voting is "the most basic of political rights" and finding that in voting rights cases a minimal quanta of injury satisfies the injury in fact requirement.) This threat must be "realistic," however, *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), not "conjectural" or "hypothetical," *Los Angeles v. Lyons,* 461

---

7. The plaintiffs, however, have questioned the likelihood of this eventuality, noting that the Wisconsin State Legislature failed during the past two redistricting cycles (in the 1980s and the 1990s) to redistrict successfully the state legislative districts (though not federal congressional districts) and that the political division between the state senate (controlled by Democrats) and the state assembly (controlled by Republicans) may make it difficult for compromise to be reached on either the state or federal legislative districts. (*See* Compl. at 11.)

8. Standing and ripeness are both considered constitutional requirements, *see Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)(standing)(citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975))(citing, in turn, *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)); *Steffel v. Thompson,* 415 U.S. 452, 458–60 & n. 10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)(ripeness), though both concepts also include prudential considerations, *see Bennett,* 520 U.S. at 162, 117 S.Ct. 1154 (standing); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)(ripeness).

U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). If truly unsupportable allegations sufficed to create jurisdiction, Article III would impose no limitation on the court's power at all. *See* Gene R. Nichol, *Injury and the Disintegration of Article III,* 74 Calif. L.Rev.1915, 1925 (1986).

In this case, the plaintiffs allege that as the law stands today, their voting rights will be diluted in the 2002 congressional elections. *See* discussion *supra.* They further allege that because of partisan division between the state senate and state assembly (and, presumably, the unusually political nature of redistricting), there is no reasonable prospect that the state legislature will be able to create a valid plan of apportionment before the Elections Board is required to prepare for the 2002 elections. (*See* Compl. at 11.) These are not unrealistic allegations. Prior to the 1992 election cycle, legislatures in twelve of the forty-three states facing redistricting failed to enact congressional reapportionment legislation.[9] *See* Congressional Quarterly, Inc., *CQ's Guide to 1990 Congressional Redistricting,* Part I, at 149–59 (1993)(discussing redistricting efforts in all fifty states).

 To determine standing at the pleading stage, the court looks only to the actual pleadings. *See Bennett v. Spear,* 520 U.S. 154, 167–68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)(citing *Lujan* 504 U.S. at 561, 112 S.Ct. 2130). As long as the pleadings realistically allege actual, imminent harm, standing has been established. *See id.* It is irrelevant for standing purposes that the harm may not develop and that the plaintiff may not be entitled to relief. *See Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)

(It would not be necessary to decide whether appellants' allegations of impairment of their votes by the 1901 apportionment will, ultimately, entitle them to any relief, in order to hold that they have standing to seek it. If such impairment does produce a legally cognizable injury, they are among those who have sustained it.).

Since the plaintiffs have met the "relatively modest" burden of alleging a realistic threat of imminent injury to their voting rights, *Bennett,* 520 U.S. at 171, 117 S.Ct. 1154, the court finds that they have satisfied the standing requirements of Article III.

 A finding of standing does not end the court's analysis, however. After concluding that the plaintiffs have alleged sufficient injury to ensure effective litigation—that is to say, once standing has been established, *see Baker,* 369 U.S. at 204, 82 S.Ct. 691 ("gist" of the standing question is whether the plaintiff will be an effective litigant)—the court must still inquire into the "ripeness" of the plaintiffs' alleged injury. For their claim to be ripe for review, the plaintiffs must stand to suffer a "palpable" injury. *See Valley Forge Christian College,* 454 U.S. at 491, 102 S.Ct. 752. If the alleged injury is to occur far in the future, if at all, the court should dismiss the lawsuit. *Cf. AT & T Corp. v. Iowa Utilities Bd.,* 525 U.S. 366, 386, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999)(directing lower court to dismiss lawsuit because the challenged administrative rule had not yet had "an immediate effect on the plaintiff's primary conduct").

This issue of jurisdictional ripeness was discussed at oral argument before the Su-

---

9. The states that failed to enact congressional reapportionment plans legislatively were Arizona, California, Colorado, Connecticut, Florida, Illinois, Kansas, Michigan, New York, Oregon, Pennsylvania, and South Carolina. Alaska, Delaware, Montana, North Dakota, South Dakota, Vermont, and Wyoming are each represented in Congress by one at-large representative and therefore have no congressional districts to reapportion.

preme Court in the *Growe v. Emison* redistricting case *(see* Tr. of Oral Arg., 1992 WL 687895, at \*4–5 (Nov. 2, 1992))[10] but was not specifically addressed in the ensuing order.[11] As federal courts bear the burden of independently ensuring Article III jurisdiction exists in any given lawsuit, *see International College of Surgeons v. City of Chicago,* 91 F.3d 981, 986 (7th Cir.1996), the court will endeavor to undertake the ripeness analysis omitted in *Growe,* and every other analagous decision of which it is aware.[12]

■ The court begins its ripeness discussion by noting that contingent future events generally do not deprive courts of jurisdiction. *Cf. Regional Rail Reorganization Act Cases,* 419 U.S. 102, 142, 95 S.Ct. 335, 42 L.Ed.2d 320 ("[T]he possibility that a court may later decline to enforce the ... Act as written ... cannot constitute a contingency itself pretermitting earlier consideration of the constitutionality of the Act."). Further, in addressing ripeness at the pleading stage—just as in addressing standing—the court must accept the facts alleged in the complaint as true and, absent contradictory evidence, not presume other facts. *See Remer v. Burlington Area Sch. Dist.,* 205 F.3d 990, 996 (7th Cir.2000)(when determining jurisdiction, the court

> must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in favor of the plaintiff. At the same time, when evidence pertinent to subject matter jurisdiction has been submitted, ... the [ ] court may properly look beyond the jurisdictional allegations of the complaint ... to determine whether in fact subject matter jurisdiction exists)

(internal quotes and citations omitted).

Since the plaintiffs have alleged that the Elections Board will carry out its legislated duty to conduct elections according to Chapter 3 of the Wisconsin Statutes in a matter of months *(see* Compl. at 11) and that doing so will dilute their voting power, among other things *(see id.* at 10, 12–13),[13]

---

**10.** "MR. TURNHEIM [appellant's attorney]: ... I would like to focus on the proper role of the Federal courts in the unique context of the decennial responsibility of redrawing the election districts within the boundaries of the States .... If there is a redistricting challenge in the state courts, if there is such a challenge, the Federal Court should abstain in favor of the State court action just as it must defer to the legislature.
 QUESTION: Well, Mr. Turnheim, I guess at least Scott v. Germano says that the Federal district court should set a timetable for the State action.
 MR. TURNHEIM: Yes.
 QUESTION: Do you concede that it is the role of the Federal court to do that much?
 MR. TURNHEIM: It—yes, I do, Your Honor. The Federal Court should under the rule retain jurisdiction to ensure that all constitutional and statutory provisions are adhered to by the State in the process."

**11.** Arguably, however, one might read the passage at 507 U.S. at 36, 113 S.Ct. 1075 ("It would have been appropriate for the District Court to establish a deadline by which, if the Special Redistricting Panel had not acted, the federal court would proceed.") as endorsing the idea that federal courts possess jurisdiction over redistricting actions, but should stay their proceedings until the appropriate state bodies have had an opportunity to act.

**12.** *See* discussion in note 16 for non-analogous cases where jurisdiction was, in fact, discussed.

**13.** Aside from dilution of voting strength, the plaintiffs allege the following:

> The malapportionment of the state's congressional districts harms the plaintiffs (and others). Until valid redistricting occurs, they cannot know in which congressional district they will reside and vote, nor do they have the ability to hold their congressional representative accountable for his or her conduct in office:
> A. Citizens who desire to influence the views of members of Congress or candidates for that office are not able to com-

it appears that the plaintiffs have met their duty of alleging sufficient injury to present a ripe controversy for review. The assertion by the proposed intervenor defendants that the Wisconsin Legislature "will take appropriate action to redraw, as necessary, Congressional district boundaries" (Resp. Br. of Def. Intervenors at 6), does not contradict the plaintiffs' propositions. In fact, the intervenor defendants concede that legislative failure to redistrict is a very real possibility. (*See* Resp. Br. of Def. Intervenors at 5) ("The Legislature will pass a reapportionment plan or reach an impasse on a Congressional reapportionment plan in late 2001 or early 2002.") Thus, the court concludes (as discussed more fully below) that it does, in fact, have jurisdiction to preside over the matter.

While the litigants themselves have failed to direct more than cursory attention to the issue, it has been discussed among the members of this panel that the Wisconsin Legislature likely *will* reapportion the State's congressional districts on its own and that this likelihood makes the plaintiffs' alleged harm too speculative truly to be "ripe." This proposition is not without force. In *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), for example, the Supreme Court ruled that federal courts are not to exercise jurisdiction over declaratory actions seeking abrogation of state laws if those laws have not been enforced and are not likely to be enforced. *See also Renne v. Geary*, 501 U.S. 312, 339, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991)(Marshall, J., dissenting)(noting that likelihood of enforcement is an issue to be considered when determining ripeness).

The short answer to the argument that the court should abstain (that is, dismiss) due to unlikeliness of enforcement is that the plaintiffs have alleged sufficient facts to show likely enforcement.[14] *See* discussion, *supra.* The longer answer is that "*Poe*-type" abstention simply doesn't apply here. Historically, *Poe*-type abstention has been applied primarily (if not solely) in cases where there has been little, or no, history of a statute's application. *Cf.* Laycock, *Modern American Remedies* 498 (2nd ed.1994)(courts "routinely entertain suits to declare statutes unconstitutional, invoking the ripeness requirement only occasionally."). Further, it, and the related *Younger*-type abstention, *see Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), have been applied primarily in the criminal law context, *cf. Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 19, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (Bren-

---

municate their concerns effectively as citizens because members of Congress or candidates may not be held accountable to those citizens as voters in the next election;

B. Potential candidates for Congress will not come forward until they know the borders of the districts in which they, as residents of the district, could seek office;

C. Citizens who desire to communicate with and contribute financially to a candidate for Congress who will represent them, a right guaranteed by the First Amendment, are hindered from doing so until districts are correctly apportioned; and

D. Citizens' rights are compromised because of the inability of candidates to campaign effectively and provide a meaningful election choice.
(Compl. at 12–13.)

**14.** It is worth noting that the state of Wisconsin has never disavowed its intention to enforce Section 3 of the Wisconsin Statutes. In *Poe*, by contrast, the state of Connecticut had long indicated its intent not to enforce the statute at bar. *See* 367 U.S. at 502, 81 S.Ct. 1752. The present case is much more analogous to *Babbitt v. United Farm Workers National Union*, where the Supreme Court found Article III jurisdiction, in part, because the state had not "disavowed" its intention to enforce as written the law then at bar. *See* 442 U.S. at 302, 99 S.Ct. 2301.

nan, J., concurring)(noting that *Younger* abstention applies primarily to challenges to criminal laws). In fact, the court is unaware of any case authority applying principles of *Poe*-type abstention to a legislative redistricting case. Indeed, doing so would present serious logistical difficulties.

While the court might be tempted to dismiss the plaintiffs' complaint and wait to see if the legislature enacts its own districting plan in a timely fashion, the question then would become "how long" must the court wait before allowing the plaintiffs to re-file. If the court were to retain jurisdiction, but merely stay proceedings, it could establish, under its docket-management powers, a time when it would take evidence and adopt its own plan if the legislature had by then failed to act. *Cf. Growe*, 507 U.S. at 36, 113 S.Ct. 1075 ("It would have been appropriate for the District Court to establish a deadline by which, if the Special Redistricting Panel had not acted, the federal court would proceed"). If the court were to disclaim jurisdiction on ripeness grounds, however, any deadline the court would set would be merely advisory ("this issue should become ripe on January 1, 2002 . . ."). Federal courts are specifically prohibited from issuing advisory opinions. *See, e.g., Muskrat v. United States*, 219 U.S. 346, 362, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

An additional problem presenting itself to a court dismissing a redistricting case for ripeness reasons and establishing a date on which it may be re-filed is that any such deadline it would set for jurisdictional (as opposed to traditional docket-management) purposes would be arbitrary. The Supreme Court has stated that a challenge to a statute becomes ripe when litigants need to start preparing to comply with it. *See New York v. United States*, 505 U.S. 144, 175, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, the present lawsuit would be ripe when citizens need to start preparing for the primary elections.[15] Such elections will be held in the fall of 2002. But who is to say when a citizen (especially a potential candidate) must start preparing for them? If a candidate were to come forward today and declare that he or she is preparing to run for Congress but is stymied by the uncertainty of the congressional districts, would the court find the candidate's complaint challenging the current apportionment plan ripe? If not, why not? Setting arbitrary deadlines (or reaching any other sort of arbitrary decision) is to be avoided. *Cf. McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the United States*, 83 F.Supp.2d 135, 148 (D.D.C.1999)(noting inappropriateness of arbitrary judicial action).

Since there is a long history of Wisconsin officials enforcing Chapter 3 of the Wisconsin Statutes (in the 1992, 1994, 1996, 1998, and 2000 congressional elections), the present lawsuit does not implicate a criminal law, and application of *Poe*-type abstention principles to a redistricting case such as the one at bar would present logistical problems, the majority of the court finds that the *Poe* doctrine does not prevent adjudication of the current lawsuit.

Another type of abstention, "*Pullman* abstention," *see Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), might also be

---

**15.** Parenthetically, the court notes that the plaintiffs in this case *have* alleged that they are unable to prepare for the upcoming elections. They claim that they would like to communicate with and contribute financially to congressional candidates who may represent them but, due to the present uncertainty of district boundaries, are unable to identify appropriate candidates. *(See* Compl. at 13.)

said to provide some guidance in this case. That form of abstention applies when a federal court is faced with an ambiguous question of state law that touches on important matters of state policy. Importantly, however, *Pullman* abstention requires only a stay of proceedings while a state court addresses the matter, not complete dismissal. *See* 312 U.S. at 501–02, 61 S.Ct. 643. Thus it, too, fails to prevent the court's exercise of jurisdiction here. In fact, the majority of the court concludes that there is no applicable jurisdictional doctrine that would require dismissal of the plaintiffs' case while the state attempts to reapportion its legislative districts on its own.

While not specifically analyzing issues of ripeness as the panel has here, previous courts faced with arguably premature redistricting lawsuits have retained jurisdiction, but entered stays so the state legislatures could act. *See, e.g., Scott,* 381 U.S. at 409, 85 S.Ct. 1525.[16] Parties have been free to file cases challenging existing districting laws at any time after the Census Bureau has certified the results of the decennial census. *See* Karlan, 71 Tex. L.Rev. at 1726. Of course, issues not debated by the parties and resolved by the court—even jurisdictional issues—do not result in binding precedent.[17] *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 119 & n. 29, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Still, the previous cases suggest a well-established (and, in the majority's opinion, very defensible) practice.

Boiled down to the bare essentials, there is a case or controversy in this case because Wisconsin's current apportionment law is unconstitutional, *see Kirkpatrick,* 394 U.S. 526, 89 S.Ct. 1225 (apportionment laws that result in districts less equipopulous than possible are unconstitutional), the Elections Board is presently bound to apply that law to the plaintiffs, *see Hastert v. State Bd. of Elections,* 777 F.Supp. 634, 637 (N.D.Ill.1991)(noting similar situation in Illinois in 1991), the plaintiffs will be injured by having their votes diluted, *see Kirkpatrick,* 394 U.S. at 531, 89 S.Ct. 1225 (equipopulous districts are required to prevent debasement of voting power), and this court can redress the situation by declaring the apportionment plan unconstitutional and entering injunctive relief, *see Growe,* 507 U.S. at 36, 113 S.Ct. 1075 (federal court may enforce its own redistricting plan if the state fails to create one itself). The alleged harm is not hypothetical. While injury is by no means certain, the plaintiffs' fear of injury is realistic. As all the elements of a justiciable case or controversy are present, *see, e.g., Friends of the Earth v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)(applicable require-

---

**16.** The court in *Flateau v. Anderson,* which stayed its hand to allow the state legislature to act, did analyze its jurisdiction under concepts of ripeness, *see* 537 F.Supp. at 262, but there consensus had emerged that the state legislature was not likely to reapportion the congressional districts without some sort of judicial intervention; that is to say, enforcement of the now-outdated apportionment was likely, and the case clearly "ripe" for the purposes of Article III jurisdiction. *See id.* A similar stalemate had been reached in *Carstens v. Lamm,* 543 F.Supp. 68 (D.Colo.1982), which also analyzed the issue of ripeness. In the present case, however (and presumably many others), at least some people feel the state legislature will succeed in redistricting on its own.

**17.** It should again be noted that the issue of jurisdictional ripeness *was* debated at oral argument in *Growe.* Further, the Supreme Court has indicated that Article III jurisdiction is determined, in part, by "traditional" notions of justiciability. *Allen,* 468 U.S. at 751, 104 S.Ct. 3315. A long tradition of retaining jurisdiction in reapportionment cases, then, would suggest that jurisdiction is, indeed, proper in such cases.

ments of a case or controversy are injury, causation, and redressability), this court is obliged to exercise jurisdiction over the matter, *cf. England v. Louisiana Bd. of Medical Examiners,* 375 U.S. 411, 415, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (" 'When a federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction' ") (quoting *Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909)); *Cohens v. Virginia,* 6 Wheat. 264, 19 U.S. 264, 404, 5 L.Ed. 257 (1821) (Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

▌ Although the majority of the court concludes that the plaintiffs' complaint states a case or controversy for constitutional jurisdictional purposes, our dissenting colleague is quite right in noting that it suffers a small statutory jurisdictional defect—the naming of an improper defendant. As it is a state agency and not a person, the Wisconsin Elections Board is not suable under 42 U.S.C. § 1983, which provides only for liability against "person[s]" who, under color of state law, deprive others of the rights, privileges, or immunities secured by the Constitution of the United States. *See, e.g., Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Since the plaintiffs have not cited an alternative ground for liability against the Wisconsin Elections Board, the court may not exercise jurisdiction over that entity and it must be dismissed. *See id.* at 71, 109 S.Ct. 2304 (affirming dismissal of § 1983 claims against state agency). The remaining defendants are proper parties to the action, however, *see id.* at 71 n. 10, 109 S.Ct. 2304 (state officials may be sued in their official capacities for injunctive relief), and the case will be permitted to proceed as to them.

Still, as discussed *supra* at 8, comity requires that the court refrain from initiating redistricting proceedings with the remaining parties until the appropriate state bodies have attempted—and failed—to do so on their own. *See Growe,* 507 U.S. at 34, 113 S.Ct. 1075. Therefore, the court will stay substantive proceedings until February 1, 2002.

In the meantime, the motions to intervene, which are unopposed, will be granted, *see* Fed.R.Civ.P. 24(a), and the court will schedule a status/planning conference with counsel for the parties for the purpose of creating an administrative plan for further proceedings.

Accordingly,

**IT IS ORDERED** that defendant Wisconsin Elections Board be and the same is hereby **DISMISSED** from the present action;

**IT IS FURTHER ORDERED** that defendant Wisconsin Elections Board be and the same shall be **REMOVED** from the case caption. With that exception, and in the absence of any further amendments with respect to named parties, any future documents filed shall bear the case caption as used above in this order;

**IT IS FURTHER ORDERED** that intervenor plaintiffs James R. Baumgart, Roger M. Breske, Brian T. Burke, Charles J. Chvala, Russell S. Decker, Jon Erpenbach, Gary R. George, Richard Grobschmidt, Dave Hansen, Robert Jauch, Mark Meyer, Rodney Moen, Gwendolynne S. Moore, Kimberly Plache, Fred A. Risser, Judy Robson, Kevin W. Shibilski, and Robert D. Wirch's motion to intervene be and the same is hereby **GRANTED.** The proposed complaint, in the form as submitted to the court on February 5, 2001, may be filed within ten days from the date of this order;

**IT IS FURTHER ORDERED** that intervenor defendants Scott R. Jensen and Mary E. Panzer's motion to intervene be and the same is hereby **GRANTED.** The proposed answer, in the form submitted to the court on February 21, 2001, may be filed within ten days from the date of this order;

**IT IS FURTHER ORDERED** that on or before **December 19, 2001,** counsel for the plaintiffs shall prepare and file with the court, after consultation with all parties, a proposal regarding the schedule and administrative plan for the efficient judicial processing of this action. If there are disagreements regarding the proposal, such disagreements shall be specifically noted and accompanied by a statement detailing the parties' positions on the disagreements. Plaintiffs' counsel shall prepare materials responsive to the preceding sentence after consultation with counsel for the other parties;

**IT IS FURTHER ORDERED** that on **Monday, January 7, 2002, at 3:30 p.m.,** the court will conduct a status/planning conference in Courtroom 284 of the United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin. Counsel for each party shall telephone the court at least two business days prior to the conference to inform the court as to who will be appearing for that party; and

**IT IS FURTHER ORDERED** that all substantive judicial proceedings in this action be and the same are hereby **STAYED** until February 1, 2002, or until further order of the court.

EASTERBROOK, Circuit Judge, dissenting.

This complaint must be dismissed. It does not present a case or controversy within the meaning of Article III, and it also encounters problems of statutory authority. I start with the latter, which can be fixed in a way that the Article III problem cannot be.

The complaint, filed under 42 U.S.C. § 1983 (and requiring a three-judge district court under 28 U.S.C. § 2284(a)), names as defendants Wisconsin's Elections Board, plus all of its members (plus its executive director) in their official capacities. Yet we know from *Arizonans for Official English v. Arizona,* 520 U.S. 43, 69, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), and *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), that states and their agencies are not "persons" subject to suit under § 1983. What is more, official-capacity suits are equivalent to suits against the entities themselves. See *Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Accordingly, none of the defendants is a "person" subject to suit under § 1983. The complaint could be repaired by an amendment dismissing the Elections Board and naming the natural persons in their individual capacities, using the approach of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), avoiding entanglements under the eleventh amendment in the process. See also *Hafer v. Melo,* 502 U.S. 21, 25–31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). It may be that, with the Board dismissed, even an official-capacity action against the members could proceed on the fiction that prospective relief does not "really" bind the state, nimbly evading not only the eleventh amendment but also the limitations on the definition of a "person" under § 1983. See *Will,* 491 U.S. at 71 n. 10, 109 S.Ct. 2304. But the Article III problem is more severe.

Today Wisconsin has nine members in the House of Representatives. As a result of the 2000 Census, it is entitled to elect only eight in 2002. This suit was filed immediately after the apportionment of

representatives among the states was announced in February 2001. Plaintiffs do not allege that when the suit began the State of Wisconsin had failed to carry out its responsibility to revise its plan of apportionment. February 2001 was the beginning, and even now (in November 2001) the process is *in medias res.* The best face one can put on this complaint is that plaintiffs predict that Wisconsin will fail to enact eight equal-size districts. Yet a prediction that something will go wrong in the future does not give standing today. One might as well commence a suit as soon as some legislator introduces a bill that would be unconstitutional if enacted. Until the bill *is* enacted there is nothing to litigate about. See, e.g., *Illinois v. Chicago,* 137 F.3d 474 (7th Cir.1998) (collecting cases). So too here; until Wisconsin either enacts an invalid apportionment, or fails to create the districts necessary to hold an election in November 2002, anything we do would be advisory. An uncharitable person would be inclined to say that this suit was filed in February 2001 to be first in the queue for attorneys' fees in the event litigation becomes necessary. But reserving a place in line is not a proper reason to invoke the judicial power. We should dismiss this complaint and make it clear that no replacement will be received until there is a real controversy (which by entering a stay my colleagues imply could not happen before February 2002).

The majority does not disagree with any of these points but nonetheless thinks that there is a live controversy. Because this is in part an issue of timing, they look to ripeness doctrine and observe that a case may be held until it becomes ripe for decision. See, e.g., *Buckley v. Valeo,* 424 U.S. 1, 113–18, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 73, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Yet ripeness, a prudential doctrine, differs from standing, a constitutional doctrine. Standing depends on injury in fact, and these plaintiffs have not been injured. Nor is injury impending, to be averted only by judicial action. Wisconsin does not propose to conduct the 2002 elections under the existing plan. Indeed, Wisconsin *could not* conduct the elections under the existing plan even if it tried, because the current plan provides for nine representatives while the new apportionment allows only eight. Action by the judicial branch is not necessary to stop Wisconsin from electing nine representatives. The legislative branch and the executive branch have nixed any such possibility already. Because electing nine representatives is inconceivable no matter what the court does, injury is missing and no decision of the court could (or is required to) redress the problem.

This suit, as it stands, is equivalent to asking the judicial branch to enjoin implementation of a state pollution control plan that the EPA has canceled and that can't be enforced without the agency's cooperation (as representatives can't be seated in Congress without its approval). A suit might lie against the EPA by someone wanting to revivify the state plan, but no plaintiff would have standing to ask the judiciary to drive a second stake through the plan's heart. One death is enough. This lawsuit is governed by that principle. Judicial action in February 2001 (or today) would be redundant and thus advisory in the most basic sense.

It is unhelpful to observe that the existing nine districts have had population shifts that render them malapportioned on the one-person-one-vote standard. My colleagues rely on law review commentary for the proposition that every Census makes all legislative districts automatically unconstitutional and thus creates an Article III controversy right out of the box in every state, before the legislature has had a chance to act. I have my doubts about

this proposition, but it is unnecessary to consider it in detail. Because these nine districts are already in the garbage bin of history—they were consigned to that position by the political branches of the national government—it is irrelevant what other flaws they may have. A declaration that they would be malapportioned if used again (which they can't be) would be advisory, solving no real controversy and offering no one any relief. See *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102–09, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (discussing the three ingredients of standing: injury in fact, causation, and redressability). Plaintiffs are not injured by a defunct plan, and that non-injury cannot be redressed by anything we may say about historical relics.

This suit therefore must be dismissed. A new suit, filed after the legislature enacts a plan with constitutional flaws (or fails to act in time to allow a valid election next year) could present a real controversy. But *this* suit was dead on arrival and cannot be called to life by later developments—either in the legislature or by intervention of persons who want to contest the way in which the state legislature is apportioned. Therefore I shall take no further part in the consideration or decision of No. 01–C–121, though if a new complaint is filed (concerning either state or federal elections) Chief Judge Flaum may elect to appoint the same three-member panel so that the litigation can proceed. But unless a fresh suit is filed, this has become a two-judge court, and *whatever* it does may end up being vacated by higher authority on Article III grounds. Would it not have been vastly superior for prudential, as well as jurisdictional, reasons to junk this bit of "instant litigation" and wait for a real controversy?